IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CAROLENE BURNS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 05-01036-CV-W-REL-SSA ) |
| LINDA S. McMAHON, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Carolene Burns seeks review of the Commissioner of Social Security's final order denying her application for supplemental security income benefits under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381, et seq. Plaintiff argues that the Administrative Law Judge ("ALJ") erred (1) in relying on the testimony of the vocational expert, as the answers given were not responsive to the ALJ's questions, and (2) by not asking the vocational expert whether the jobs she testified Plaintiff could perform conflicted with information in the Dictionary of Occupational Titles ("DOT"). I find that the ALJ properly relied on the vocational expert's testimony in determining that Plaintiff was not disabled under the Act, and that any error resulting from the ALJ's failure to ask the vocational expert about conflicts with the DOT was harmless. As a result, Plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

### I. BACKGROUND

On April 23, 2003, Plaintiff filed an application for supplemental security income benefits, alleging that she had been disabled since April 3, 2002. Plaintiff did not become eligible for

benefits, however, until April 14, 2003. Her disability stems from pain in her hands and past carpal tunnel surgery with continuing discomfort, arthritis pain in her neck, hip and legs, liver dysfunction due to Hepatitis C, and cirrhosis with fatigue. Plaintiff's application was denied initially. On April 21, 20056, a hearing was held before an ALJ. On May 18, 2005, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On September 16, 2005, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of a "final decision" of the Commissioner under Title XVI. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence as provided by 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3); see also Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Johnson,108 F.3d at 179. "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)(citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial

2

Case 4:05-cv-01036-REL   Document 10   Filed 02/02/07   Page 2 of 17

evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Jernigan, 948 F.2d at 1073 n.5 (quoting Baker v. Heckler, 730 F.2d 1147, 1150-51 (8th Cir. 1984)).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming supplemental security income benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. See Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 416.1920 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

>   Yes = disabled.
>   No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

>   No = not disabled.
>   Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

>   Yes = disabled.
>   No = not disabled.

## IV. THE RECORD

The record consists of the testimony of Plaintiff, Plaintiff's daughter Michelle Nigh, and vocational expert Lesa Keen, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE RECORDS

Plaintiff's earnings record reveals she earned the following income:

| Year | Amount    | Year | Amount     |
|------|-----------|------|------------|
| 1972 | $  37.13  | 1987 | $6,039.18  |
| 1973 | 0.00      | 1988 | 228.64     |
| 1974 | 344.17    | 1989 | 0.00       |
| 1975 | 1,023.66  | 1990 | 0.00       |
| 1976 | 96.81     | 1991 | 0.00       |
| 1977 | 516.59    | 1992 | 480.00     |
| 1978 | 3,255.70  | 1993 | 3,208.88   |
| 1979 | 966.63    | 1994 | 0.00       |
| 1980 | 0.00      | 1995 | 0.00       |
| 1981 | 2,079.03  | 1996 | 863.60     |
| 1982 | 2,008.36  | 1997 | 0.00       |
| 1983 | 0.00      | 1998 | 0.00       |
| 1984 | 0.00      | 1999 | 592.06     |
| 1985 | 0.00      | 2000 | 6,899.73   |
| 1986 | 0.00      | 2001 | 4,929.59   |
|      |           | 2002 | 3,592.23   |

(Tr. at 81-84).

## B. SUMMARY OF MEDICAL RECORDS

On March 11, 2002, Plaintiff saw Robert Buzard, M.D., and complained of numbness in her fingers and wrists (Tr. at 148). Dr. Buzard noted a full range of motion and minimal tenderness in her wrists (Tr. at 148). He suspected carpal tunnel syndrome (Tr. at 148). Plaintiff returned to see Dr. Buzard on March 25, 2002, and April 1, 2002 (Tr. at 146- 47). Nerve conduction studies and an electromyography were conducted on April 2, 2002 (Tr. at 174). The tests showed mild bilateral carpal tunnel syndrome (Tr. at 174). On April 3, 2002, Dr. Buzard released Plaintiff to work with a ten-pound lifting limit (Tr. at 145).

Plaintiff saw David Paul, D.O., for evaluation of her carpal tunnel syndrome on April 5, 2002 (Tr. at 173). Dr. Paul noted that Plaintiff had a full range of motion in her wrists with slightly decreased sensation in her fingertips (Tr. at 173). Dr. Buzard evaluated Plaintiff's carpal tunnel syndrome again on April 8, 2002, and suggested she not work until after her surgeries (Tr. at 144).

Dr. Paul performed a left carpal tunnel release on April 19, 2002 (Tr. at 170, 171). Plaintiff was doing well on May 3, 2002, two weeks after the surgery (Tr. at 169). Dr. Paul performed a right carpal tunnel release on May 24, 2002 (Tr. at 167, 168). On June 7, 2002, Plaintiff complained of some sensitivity and discomfort over her left wrist incision, but was otherwise doing well (Tr. at 166). On July 12, 2002, Plaintiff reported she had fallen on her right arm (Tr. at 165). Dr. Paul noted a full range of motion in both wrists with some swelling around the incision (Tr. at 165).

5

Case 4:05-cv-01036-REL   Document 10   Filed 02/02/07   Page 5 of 17

On July 25, 2002, Plaintiff saw Brian Divelbiss, M.D., for evaluation of her carpal tunnel syndrome (Tr. at 155). Dr. Divelbiss noted normal active range of motion with decreased sensation of moving light touch (Tr. at 155). Dr. Divelbiss diagnosed pillar pain, probable median nerve neuritis[1] secondary to the carpal tunnel release and bilateral thumb carpal metacarpal joint pain (Tr. at 155).

On August 2, 2002, Dr. Paul noted some sensitivity to the wrist region with no significant pain (Tr. at 164). Plaintiff had decreased sensation with a full range of motion in her fingers and wrists (Tr. at 164). Dr. Paul recommended she do no lifting greater than five pounds with no repetitive motion of the wrists (Tr. at 164).

Douglas Rope, M.D., evaluated Plaintiff on August 5, 2002 (Tr. at 157-60). Plaintiff had tenderness with palpation over her left wrist (Tr. at 159). Two-point discrimination was normal, and Plaintiff had some diminution of monofilament sensation over her fingers (Tr. at 160). Dr. Rope reported that Plaintiff was at maximal medical improvement (Tr. at 160). He recommended she avoid activities requiring vigorous or repetitive grasping (Tr. at 160). Plaintiff was given a disability rating of 17% for her right arm and 15% for her left arm (Tr. at 160).

Plaintiff saw Dr. Paul on August 30, 2002, and reported doing much better (Tr. at 163). Dr. Paul noted a good range of motion and good strength and stated Plaintiff could return to work without restrictions (Tr. at 163). On October 4, 2002, Plaintiff reported some swelling, radiating pain, and tingling in her hands and fingers; she did not have significant pain in her wrist (Tr. at 162). Dr. Paul detected a full range of motion (Tr. at 162). He released Plaintiff without

---

[1] Neuritis is an "[i]nflammation of a nerve." STEDMAN'S MEDICAL DICTIONARY 1199 (26th ed. 1995).

restrictions and noted that some of her subjective complaints were more significant than the objective findings (Tr. at 162). On October 23, 2002, Dr. Paul opined Plaintiff had permanent partial disabilities of 8% of the left arm, or 5% of the whole person, and 8% of the right arm or 5% of the whole person (Tr. at 175).

On July 1, 2003, Plaintiff saw Ian Belson, D.O., for a disability evaluation (Tr. at 149-151). Dr. Belson noted limited mobility in Plaintiff's wrists and pain with minimal touch (Tr. at 150). He recommended further tests to determine her nerve problems (Tr. at 151).

Plaintiff went to the Richmond Family Clinic on March 25, 2004, and reported bilateral and left arm pain (Tr. at 249). She was diagnosed with paresthesia[2] in her left arm (Tr. at 249).

On April 1, 2004, Plaintiff underwent an abdominal ultrasound, which showed hepatomegaly[3] and splenomegaly[4] (Tr. at 248). An abdominal CT, performed on April 12, 2004, showed mild enlargement of the liver and spleen (Tr. at 246-247).

Plaintiff underwent a normal nerve conduction study of her left arm on April 13, 2004 (Tr. at 245). She returned to the Richmond Family Clinic on April 26, 2004, reporting left arm pain, heart palpitations, neck pain, and shoulder pain (Tr. at 239). On April 29, 2004, Plaintiff had an MRI of her cervical spine, which showed very mild arthritis (Tr. at 238).

On May 17, 2004, Plaintiff saw Vincent Johnson, D.O., for evaluation of her neck, shoulder, and left arm paresthesia (Tr. at 235-236). Dr. Johnson noted Plaintiff had a full range

---

[2] "An abnormal sensation, such as of burning, pricking, tickling, or tingling." STEDMAN'S MEDICAL DICTIONARY at 1300.

[3] "Enlargement of the liver." STEDMAN'S MEDICAL DICTIONARY at 787.

[4] "Enlargement of the spleen." STEDMAN'S MEDICAL DICTIONARY at 1654.

of cervical motion with some tenderness to palpation (Tr. at 235-236). She also had good upper extremity strength (Tr. at 236). Dr. Johnson diagnosed myofascial pain (Tr. at 236).

Plaintiff saw Thomas Jones, M.D., on May 20, 2004 (Tr. at 191-192, 233-234). Dr. Jones noted that Plaintiff had elevated liver enzymes with hepatosplenomegaly[5] and thrombocytopenia[6] and suspected cirrhosis (Tr. at 192). On June 4, 2004, Dr. Jones performed an esophagogastroduodenoscopy with biopsy (Tr. at 201-202, 227-225). Plaintiff was diagnosed with possible chronic hepatitis C and hepatosplenomegaly with elevated liver enzymes on July 8, 2004 (Tr. at 190, 223). On August 24, 2004, a liver biopsy indicated hepatitis C (Tr. at 198, 216). Plaintiff followed up with Dr. Jones on September 9, 2004, and September 17, 2004, for further treatment (Tr. at 188, 189, 211, 215).

On November 8, 2004, Plaintiff saw Joyce Majure-Lees, M.D., for a disability evaluation (Tr. at 177- 87). Dr. Majure-Lees reported that Plaintiff had a normal gait (Tr. at 178). Plaintiff had an enlarged liver (Tr. at 178). She had a full range of motion of her shoulders, elbows, and wrists (Tr. at 178, 181-184). Plaintiff had full grip and upper extremity strength (Tr. at 179). Dr. Majure-Lees noted that she was able to pick up small objects and write (Tr. at 179). Plaintiff had some decreased sensation in her left middle finger, but otherwise displayed good use of her hands for fine motor movement (Tr. at 179). Dr. Majure-Lees found no definite evidence of carpal tunnel syndrome (Tr. at 179).

Dr. Majure-Lees completed a medical source statement, stating that Plaintiff could

---

[5]"Enlargement of the liver and spleen." STEDMAN'S MEDICAL DICTIONARY at 787.

[6]"A condition in which there is an abnormally small number of platelets in the circulating blood." STEDMAN'S MEDICAL DICTIONARY at 1808.

occasionally lift twenty pounds and frequently lift ten pounds (Tr. at 185). She could stand at least two hours and sit approximately six hours in an eight-hour work day with normal breaks; her ability to push and pull were not affected (Tr. at 185-186). Plaintiff could frequently climb ramps and stairs, balance, and kneel, and occasionally crouch, crawl and stoop (Tr. at 186).

### C. SUMMARY OF TESTIMONY

During the hearing, Plaintiff and Plaintiff's daughter, Michelle Nigh, testified; vocational expert Lesa Keen also testified at the request of the ALJ.

**1. Plaintiff's testimony.**

Plaintiff testified that she was 48 years old (Tr. at 262). She stated she had a tenth grade education and a GED (Tr. at 264). Concerning her alleged impairments, Plaintiff testified that she had undergone carpal tunnel surgery on both hands; her hands still became swollen and were "sore" and "achy" (Tr. at 264). Plaintiff also has non-alcoholic cirrhosis of the liver due to hepatitis C (Tr. at 264-265). She further testified she has arthritis in her legs, shoulders, right hip, and neck (Tr. at 265). Plaintiff said she could not perform full-time work because she takes a three- to four-hour nap everyday due to fatigue from her hepatitis C (Tr. at 265).

When asked about her activities, Plaintiff testified that her older daughter helped with the heavy house cleaning and laundry (Tr. at 266). She stated that she was only able to do light dusting and cook small meals (Tr. at 266). A typical day included spending time with her older daughter, Michelle, talking with neighbors outside, watching television, and helping her nine-year-old daughter with her homework (Tr. at 267). Plaintiff reported she lived on child support ($408.00/month) and food stamps ($101.00/month). She stated that she did not drive very often (Tr. at 268). Plaintiff did not believe she could work as a security monitor, information clerk, or

9

cashier as suggested by the vocational expert due to the fact that, in approximately two months, she would be taking chemotherapy shots for forty-eight weeks (Tr. at 276).

    2.    **Plaintiff's daughter's testimony.**

Plaintiff's daughter, Michelle Nigh, also testified at the hearing (Tr. at 269-274). She stated she saw Plaintiff every day (Tr. at 270). Ms. Nigh testified that she took her mother out of the house to do things (Tr. at 270). She also performed household chores such as vacuuming the stairs, making the bed, doing the dishes and laundry, and occasionally cooking; she performed these tasks because they were "really hard" on Plaintiff and took her "all day" to complete (Tr. at 270).

Ms. Nigh testified she typically arrived at Plaintiff's house around 8:00 a.m. (Tr. at 271). Plaintiff then either ran errands with her or stayed home and rested on the couch (Tr. at 271). Plaintiff also goes to Ms. Nigh's house four to five times a week to eat (Tr. at 271). Ms. Nigh stated that Plaintiff did not drive often because it was hard on her hands (Tr. at 272). When asked by Plaintiff's counsel whether she thought Plaintiff could work as a security monitor, Ms. Nigh responded that Plaintiff would probably fall asleep (Tr. at 273).

    3    **Vocational expert testimony.**

Vocational expert Lesa Keen testified at the request of the ALJ (Tr. at 261-262, 274-276). The ALJ asked Ms. Keen to assume a hypothetical person with impairments including: pain in the upper extremities; a possible bilateral carpel tunnel problem for which she has had surgery but complains of continuing discomfort; liver dysfunction, including hepatitis C; pain in the legs, hips and neck due to arthritic problems; and fatigue (Tr. at 274). The ALJ first ask Ms. Keen whether, with these problems in combination, such a person could perform Plaintiff's past work

if she were (1) restricted to sedentary work, (2) could lift up to ten pounds infrequently and two to three pounds more frequently, (3) needed to work in a seated position with occasional opportunities "to get up and move about so as to alleviate discomfort" (Tr. at 274-275). Ms. Keen responded that such an individual could not perform any of Plaintiff's past relevant work (Tr. at 275). She further testified that such an individual could, instead, perform sedentary, unskilled positions that offer a sit/stand option such as a security systems monitor, information clerk, and sedentary cashier, all of which exist in the national and local economy (Tr. at 275).

The ALJ next hypothesized that the individual needed to lie down and rest for two to four hours during the course of the day (Tr. at 275). Ms. Keen stated that such an individual would not be able to maintain any full-time job in the national economy (Tr. at 275). Lastly, the ALJ assumed that the individual would miss "two or three or more days work" because of her impairments (Tr. at 275-276). Ms. Keen similarly answered that such an individual would not be able to maintain any work (Tr. at 276).

### D. FINDINGS OF THE ALJ

On May 18, 2005, the ALJ issued an opinion finding that Plaintiff was not disabled at step five of the sequential analysis. The ALJ found at step one that Plaintiff had not worked since her alleged onset of disability (Tr. at 21). At step two, the ALJ found that Plaintiff had a number of severe impairments including: pain in the upper extremities and past carpal tunnel surgery with continuing discomfort; arthritis pain in the neck, hip and legs; and liver dysfunction due to hepatitis C and cirrhosis with fatigue (Tr. at 21). He found at step three that the impairments did not "meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4" (Tr. at 21). Although the ALJ found Plaintiff's impairments

prevented her from performing past relevant work at step four, he found there were a significant number of jobs in the national economy that she could perform (Tr. at 22).

## V.  VOCATIONAL EXPERT'S TESTIMONY

Plaintiff does not challenge the ALJ's assessment of the evidence or residual functional capacity finding as determined from the evidence.  Instead, Plaintiff contends that the jobs identified by the vocational expert do not fall within the ALJ's residual functional capacity finding, are not responsive to the ALJ's hypothetical questions, and conflict with the DOT's descriptions of such jobs.

First, I disagree that the jobs identified by the vocational expert fell outside of the ALJ's residual functional capacity finding or that they were nonresponsive to the hypotheticals.  The ALJ found that Plaintiff had the

> residual functional capacity to perform the exertional demands of less than a full range of sedentary work which requires maximum lifting of ten pounds occasionally and 2 to 3 pounds frequently.  (20 C.F.R. § 416.967)  The claimant can only work in a seated position and she requires the ability to occasionally get up and walk about to relieve discomfort.

(Tr. at 22).  Based on this finding, the ALJ asked the vocational expert whether an individual with Plaintiff's impairments could perform Plaintiff's past relevant work if he or she were (1) restricted to sedentary work, (2) could lift up to ten pounds infrequently and two to three pounds more frequently, (3) needed to work in a seated position with occasional opportunities "to get up and move about so as to alleviate discomfort" (Tr. at 274-275).  The vocational expert testified such an individual could not perform past relevant work, but that he or she could instead perform sedentary, unskilled positions offering a sit/stand option such as a security systems monitor, information clerk, and sedentary cashier (Tr. at 275).

The jobs identified by the vocational expert are all classified as sedentary positions. See U.S. Dep't of Labor, Dictionary of Occupational Titles §§ 211.462-026, 237.367-022, 379.367-010 (4th ed. rev. 1991). Sedentary work involves

> exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

U.S. Dep't of Labor, Dictionary of Occupational Titles, at 1013. Plaintiff argues that because the security systems monitor, information clerk, and cashier positions are "fully sedentary," they fall outside the ALJ's finding that she retained the capacity to perform the exertional demands of "less than a full range of sedentary work."

The jobs identified by the vocational expert do not exceed the ALJ's residual functinal capacity findings. Specifically, the ALJ found that Plaintiff could lift up to ten pounds occasionally and two to three pounds frequently; the jobs the vocational expert testified Plaintiff could perform required exerting a maximum of ten pounds of force occasionally and a negligible amount of force frequently. Plaintiff's need to work in a seated position is also consistent with sedentary work involving sitting most of the time. The ALJ's finding that Plaintiff "requires the ability to occasionally get up and walk about to relieve discomfort" is, therefore, the factor that limits her to performing less than the full range of sedentary work. The vocational expert took this factor into consideration by responding to the ALJ's hypothetical with sedentary jobs that offered a sit/stand option. As a result, the jobs identified by the vocational expert were both consistent with the ALJ's residual functional capacity finding and responsive to his hypothetical

13

question.

Second, the jobs identified by the vocational expert do not conflict with the information in the DOT. Plaintiff argues that the jobs the vocational expert testified she could perform are all described as "fully" sedentary positions in the DOT and none the descriptions for these positions indicate a worker could "get up and move about to relieve discomfort." She also argues that the information clerk and cashier jobs are not unskilled positions.

Plaintiff is correct that the DOT does not classify a surveillance system monitor, information clerk and cashier as "less than a full range of sedentary work." However, the only categories used to describe the physical demands of a position are "sedentary work," "light work," "medium work," "heavy work," and "very heavy work"; a "less than full range of sedentary work" category simply does not exist. Moreover, the DOT classifications list the maximum requirements of a position rather than the full range of requirements. Soc. Sec. Rul. 00-04p. As such, it is entirely possible that an individual restricted to limited sedentary work could perform a job that falls within the "sedentary work" category. See Ellison v. Sullivan, 921 F.2d 816, 821-22 (8th Cir. 1990)(stating vocational expert did not identify any jobs individual who was only capable of limited sedentary work could perform when none of the jobs suggested fell into the sedentary category). The three positions identified by the vocational expert thus do not conflict with the DOT classifications for this reason.

Plaintiff is also correct that the DOT descriptions for a surveillance system monitor, information clerk and cashier, respectively, do not expressly state that a worker in any of these

14

positions would be allowed to "get up and move about to relieve discomfort."[7]  Social Security Ruling 00-04p states that

> [t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings.  A [vocational expert], [vocational specialist], or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT.

The vocational expert's testimony in this case did exactly that.  In response to the ALJ's hypothetical wherein the individual would "perhaps [need to have] some occasional opportunit[ies] to get up and move about so as to alleviate discomfort," the vocational expert testified that such an individual could perform sedentary jobs with a sit/stand option such as a surveillance system monitor, information clerk and cashier.  A sit/stand option certainly contemplates a worker being able to alleviate discomfort by movement.  Again, because the DOT job descriptions did not contain information as to whether these jobs allow a sit/stand option, the vocational expert was merely providing more specific - - rather than conflicting - - information.

---

[7]The DOT describes the duties of a "surveillance-system monitor" as follows:
> Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites.  Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designed agency to notify authorities of location of disruptive activity.  Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

U.S. Dept. of Labor, Dictionary of Occupational Titles § 379.367-010.  An "information clerk":
> Answers inquiries from persons entering establishment: Provides information regarding activities conducted at establishment, and location of departments, offices, and employees within organization.  Informs customer of location of store merchandise in retail establishment.  Provides information concerning services, such as laundry and valet services, in hotel.  Receives and answers requests for information from company officials and employees.  May call employees or officials to information desk to answer inquiries.  May keep record of questions asked.

U.S. Dept. of Labor, Dictionary of Occupational Titles § 237.367-022.  The "cashier" position that most closely fits Plaintiff's restrictions is described as:
> Cashes checks, prepares money orders, receives payment for utilities bills, and collects and records fees charged for check-cashing service.  May receive payment and issue receipts for such items as license plates.

U.S. Dept. of Labor, Dictionary of Occupational Titles § 211.462-026.

The ALJ did not err in relying on this evidence.

Finally, Plaintiff argues that the information clerk and cashier jobs are beyond her ability since the vocational expert testified she could only perform unskilled positions. Unskilled work is work that "a person can usually learn to do . . . in 30 days, and little specific vocational preparation and judgment are needed." 20 C.F.R. § 416.968. The DOT lists the specific vocational preparation, or time required for an individual to learn to perform the required job duties, for a check cashier as being one to three months, for a information clerk as being three to six months, and for a surveillance system monitor as anything beyond a short demonstration up to and including one month. See U.S. Dep't of Labor, Dictionary of Occupational Titles §§ 211.462-026, 237.367-022, 379.367-010. Notably, the ALJ did not find Plaintiff could only perform unskilled work (See Tr. at 21-22). Any inconsistency between the vocational expert's testimony and the jobs she stated Plaintiff could perform is not fatal. The fact remains that 76,000 surveillance system monitor jobs exist in the national economy, 750 of which are in Missouri. Accordingly, the Commissioner successfully satisfied the burden of proving Plaintiff could perform work that exists in significant numbers. See Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997)(holding 340 jobs was a significant number); Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988)(holding 500 jobs were significant). Plaintiff's motion for summary judgment is denied on this ground.

## VI. SOCIAL SECURITY RULING 00-4p

Social Security Ruling 00-4p requires an ALJ to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] . . . and information in the Dictionary of Occupational Titles." Plaintiff maintains that the ALJ's

failure to do so in this case constitutes reversible error. I disagree.

As explained more fully above, the vocational expert's testimony that the surveillance system monitor, information clerk and cashier positions are sedentary jobs with a sit/stand option does not conflict with information in the DOT. The ALJ's failure to inquire about the apparent conflict between the vocational expert's testimony that a check cashier and information clerk were unskilled positions and the DOT's specific vocational preparation ratings for these jobs proved harmless in light of significant number of surveillance systems monitor positions existing in the economy.

## VII. CONCLUSION

Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 1, 2007